### H. KABELMACHER ET AL. V. EMMA KABELMACHER.

Decided May 10, 1899.

**1. Will—Testamentary Capacity—Undue Influence.**

See evidence under which it is held that the court, upon the question of the admission of a will to probate, should have submitted the issues as to testamentary capacity and undue influence to the jury.

**2. Costs—Transcript—Fee Bill Construed.**

Section 22 of the fee bill passed by the Twenty-fifth Legislature (Acts 1897, Called Session, p. 12), limits the fees allowed to clerks of the district court of every county in civil actions to 10 cents per hundred words; it is not affected by section 7 of the same act, which exempts certain counties from the operation of sections 1 to 6,—such sections relating only to fees in criminal cases.

ERROR to Comal. Tried below before Hon. H. TEICHMUELLER.

The will in question left all the testator's property, about $6000, to his wife, Emma Kabelmacher, she to be executrix and to give no bond, and the probate court to have nothing to do with the administration.

The following statement in full of the testimony offered is taken from the brief of defendant in error:

Christian Hoffheinz testified for the proponent: "My name is Christian Hoffheinz. I am a subscribing witness to the instrument offered as the last will and testament of Charles Kabelmacher, deceased. I knew Charles Kabelmacher in his lifetime; he was my son-in-law; that is, he married my daughter. The proponent, Emma Kabelmacher, is my daughter, and is the widow of Charles Kabelmacher, deceased. Charles Kabelmacher died on January 21, 1898, some seven weeks or such after signing the will. His wife Emma survived him. They had no children. Charles Kabelmacher left an estate such as is set out in the inventory and appraisement. [Said inventory and appraisement is hereto attached and marked Exhibit A and made part of this statement of facts.] The will here offered was signed and executed by Charles Kabelmacher in my presence and in the presence of H. Kabelmacher, the other subscribing witness, on the 5th day of December, 1897, at his home at Anhalt, Comal County, Texas, about twenty-five miles west of here. Charles Kabel-

macher at the time of signing the will was 26 or 27 years old, and married. Both myself and the other subscribing witness were over fourteen years old when we subscribed the will as witnesses. Charles Kabelmacher, at the time of the execution, was fully acquainted with the contents and the provisions of the will. He signed it freely of his own volition and requested us to sign it as witnesses. He signed it in our presence and we signed it in his presence, and in presence of each other. He was of sound and disposing mind and memory at the time, master of all his mental faculties, fully aware of the import of his act, and capable of fully understanding it. The sole beneficiary in the will, Emma Kabelmacher, was his wife and is now his widow. That instrument [the witness was here shown the alleged last will and testament of Charles Kabelmacher deceased, which is set out after this direct examination] is the will. That is the signature of Charles Kabelmacher, this is my signature, and this is the signature of H. Kabelmacher, the other subscribing witness."

Cross-examination: "On the morning of December 5, 1897, before breakfast, Charles Kabelmacher asked me for the will. I produced it, and he stated to me that he wished to execute it that morning, as both myself and his brother Henry Kabelmacher were then at the house and could sign it as witnesses. This was about an hour and a half before breakfast. H. Kabelmacher was not in the room at that time; no one was in the room but the testator and myself. He was in bed and sick at the time; he was suffering from consumption. He was weak in the body, but could sit up in bed, and with very little assistance could walk around in the room. On this morning he was sitting up in the bed with pillows back of him. He had but very little fever at this stage of his sickness, and had no fever at all on that morning. I offered to read the will over to him that morning, but he said that it was not necessary, as he knew its contents. I then fully explained it to him. I told him that his wife gets all of his property, land as well as personalty; that she is the executor without bond, and that she will not be under the supervision of the probate court, but will act independently in the manner that she deems best. He said that was the way he wanted it, that it was the same as the will to my wife. I told him yes, it was just like my will. This occurred before breakfast while he and I were alone. His eyes were sore at the time. I first handed him the will to read, but he handed it back to me, saying that his eyes were too bad to read. His eyes had become sore while he was at the hospital at New Braunfels. He attributed his sore eyes to the electric lights in the hospital. I do no know if that was the cause, but I know that they were sore. When I brought Carl Kabelmacher home from the hospital, about two or three weeks before that 5th day of December, he spoke to me about making a will in favor of his wife, and asked my advice as to the manner in making it. I told him that I had made my will in favor of my wife, giving her all my property, making her executor without bond or security, and withdrawing my estate from the jurisdiction of the court. He said that was what he wanted to do and asked me to let him see my will. After we got home I showed him my

will. He began to read it, but his eyes were bad and he asked me to read it for him, which I did, and he then asked me to write one like it for him. I told him that I did not like to write it, that my brother F. Hoffheinz, who is a notary public, wrote my will, and that he is a very good hand at such things. He then asked me to see my brother and have him write a will for him (Charles Kabelmacher), and gave as directions that everything should go to his wife, that she be executrix without bond and be free from the probate court, just as is stated in my will. In a few days, about two weeks before December 5th, I had my brother to prepare the will, and he sent it to me a day or two before December 5th. On that morning before breakfast Charles Kabelmacher asked me if his will had not come yet. I told him yes, it is here. I got it and handed it to him to read. He handed it back to me and said that his eyes were too sore to read. I offered to read it to him, when he said I need not read it, as he knew the contents. I, however, fully explained to him the contents and provisions of the will, as stated. He said then 'That is all right; it is as I wanted it.' I told him yes, it is like mine. He said that was right, that is what he wanted. [The witness here on the demand of contestant's attorney, J. D. Guinn, produced his own will, which was examined by said attorney and the court.] Charles Kabelmacher, the testator, then asked me to get his brother Henry and have him sign the will as a witness. He also said that he did not want his wife or sisters to know anything about it, as they would get excited and think him in a critical condition if they knew he was making a will. I found Henry outside and gave him the will to read and stated his brother's request, and told him that he did not want his wife and sisters to know it. Henry Kabelmacher read the will through and agreed to sign it as a witness. After breakfast Henry Kabelmacher and I went into Charles Kabelmacher's room; he was sitting up in bed. As soon as the ladies were out of the room, he spoke to us about the will and showed us where to find pen and ink. I do not know whether he spoke to me or to Henry about the pen and ink, and I do not remember which one of us got it; at any rate he showed us where it was on a little shelf. I handed him the will to read, but he said that his eyes were too bad to read it. He then signed it. His hand was not trembling, it was firm, and he signed it sitting up in bed, without being held or assisted, and without his hand being guided. We then both signed as witnesses at the table near by. Henry at first signed under the testator's name, and then finding that to be the wrong place, he ran a line through it and signed toward the left. The table was near the head of the bed—a foot or so from the bed; it was not behind it. The testator could have seen us sign the will if he had turned his head that way and his eyes had been good. I do not know whether he actually did see us sign the will. The table was used for medicine, drinks, and such things for the patient. Yes, I stated in the probate court, that Charles Kabelmacher had fever four or five times only during his sickness, and that these fevers lasted only a few minutes at a time, and that his pulse at the time he signed the will was from 72 to 100, and also that he was able to

sit up about the time he signed the will. I say now that he was able to sit up alone. I did not state or intend to state, in the County Court, that I first showed the will to H. Kabelmacher after it was prepared. I meant and intended to say that I first showed it to Charles Kabelmacher, and if it is written down different it is a mistake. H. is in the place of C. After the testator and we had signed the will he requested me to take care of it for him. He did not want his wife or sisters to see or hear of his having made a will. I took the will and preserved it until after his death, when I handed it to the county clerk for probate. It is the same instrument and is unaltered. I was with Charles Kabelmacher a great deal through his illness. We were neighbors; he was my son-in-law and he often sent for me. I nursed him a great deal. He was conscious up to a day before his death, and in his full senses on the morning he signed the will, and had no fever that morning. Since his death I take care of my daughter's property and look after her interests. The will was dated December 4th at the testator's suggestion, as the 5th was on Sunday, and he was afraid that it being Sunday might invalidate the will. So it was dated December 4, 1897, but in fact it was signed December 5, 1897, on Sunday."

H. Kabelmacher, for contestants: "Charles Kabelmacher was my brother. He died January 21, 1898. I signed the paper offered herein as the last will and testament of Charles Kabelmacher. I signed it under the following circumstances: My brother Charles Kabelmacher was very sick and I wanted to console him. I signed it at the request of Christian Hoffheinz, which request was made that morning just before breakfast and about an hour before I signed it. This request was made by Christian Hoffheinz in the yard out of the hearing of Charles Kabelmacher. I read the will over at the time. After breakfast Hoffheinz told me to go in with him to my brother, so he could sign it. When we went in my sister, Mrs. Bartels, was in there, and Hofheinz told her to go out, which she did, after which Hoffheinz asked Carl Kabelmacher if he wanted to read it. Then Hoffheinz presented the paper to Carl Kabelmacher and asked him to read it. Charles Kabelmacher took the paper in his two hands and said that he was too weak to read it; that he could not understand it and gave it back to Hoffheinz. Then Hoffheinz patted Charles Kabelmacher on the shoulder and said to him that it was all right to sign it, and then gave him pen and ink, which were on the table, and he signed the paper. He was at this time in the bed in a partly reclining position, propped up by pillows. Hoffheinz handed the paper to me after this and told me to sign the paper, and I signed it. I was at the time I signed the paper in the same room that Charles Kabelmacher was in. It was in the corner of the room where the table was; this was near the head of the bed and Charles Kabelmacher could not see me at the time. My position when I signed the paper as a witness was not even with, but back from, Charles Kabelmacher's head. The pen and ink were on this table, where they nearly always stayed. I have stated all that was said by Christian Hoffheinz in regard to the signing. He patted

him on the shoulder and said it was all right. Hoffheinz did not offer to read the paper to Charles Kabelmacher; the latter did not ask us to sign the paper. I had at this time been staying with my brother five or six days. I remained there afterwards five or six days and then went home for about eight days, then came back. His condition before signing the paper whilst I was with him was that he was very weak. He could not walk; he could not get out of bed without help. He could not get from the bed to the chair nor from the chair to the bed without help. He nearly always had fever and when in that condition would sometimes talk out of his head. I was with him several days before he signed the paper offered for probate as his will. He was weak in his head and his body. He would sometimes speak on one subject and then stop a moment and start on another. He would only talk about one half a minute on one subject. He would commence to say something on one subject and then start on another. He did not talk of dying, but had hopes of recovery."

Cross-examination. "I said I signed the paper to console my brother. He was worrying and grieving because he was very sick. I never consoled him that way before. I can not say that it consoled him to sign it, nor that it made him feel better. He was in the same condition afterwards. Signing the paper had no consoling effect at all. I never before heard of signing a paper being good to console a person. I got the idea from myself. When the paper was signed my brother knew me. He knew me the day before, also knew my wife and sisters. My brother did not say anything to me about the paper. Hoffheinz gave Carl Kabelmacher the paper to read. He took it in his hands and said that he could not see the paper. His eyes were good. I believe that he could see, but he was too weak to read. He said he was too weak. He was not out of his head at this time; he was all right. He held the pen himself when he signed the paper. I do not believe he was out of his head. He wrote like he was very weak. I did not say in probate court that I did not know if he was delirious on that day. Hoffheinz handed me the will to look at before breakfast. After breakfast he asked Carl Kabelmacher to sign the will. I signed it as a witness. I had heard at the time that I had an interest in the property if my brother died intestate. That is in $2000 worth of it. I did not state in probate court that I had a $2000 interest, because I did not care much about it then. I knew that the paper was a will when Hoffheinz handed it to me. I signed it as a witness on Sunday morning and stayed with my brother five or six days thereafter. Between that time and his death I would go home for a week and then return again, which I did frequently. I do not think that my brother knew me the last week of his illness. At other times when I was with him he talked with me, but his talk was incoherent. I know nothing of his signing checks after that." Question: "Did you not say in probate court that on that Saturday and Sunday he was out of his mind?" Answer: "I said in probate court that he was weak minded." Question: "On Sunday morning when he signed that will, was he out of his mind?"

Answer: "He was weak and feverish. I did not protest to Hoffheinz that my brother was too weak to sign the will. I went to tell my brother-in-law Bartels, but Hoffheinz called me back. I saw my brother-in-law after this when I went home. I did not tell him right away that Carl Kabelmacher signed the will. Some of his brothers and sisters knew before he died that he signed the will. My brother-in-law and uncle knew it. My brother had fever and pain during the time he was sick. His trouble was consumption. I do not know if he had pain."

Redirect examination: "My brother attended the public school at Anhalt in Comal County, Texas. He went until he was 15 years old. He was an educated man. He could speak English, German, and Spanish. He could speak English better than I. He learned to speak Spanish from my father's Mexican sheepherders. The property in question in this case was inherited by my brother Carl Kabelmacher from his father. He did not make it himself. I was never a juror in my life; not a witness in any case besides this one. I speak English poorly. I meant by saying that I signed the will to console him, that he was very sick and I thought that it would make him feel better. Charles Kabelmacher never asked me to sign the will. I did not understand that he wanted me to sign it. I did not tell my brother to sign the will."

Mrs. Mina Elbel, for contestants: "I am a sister of the deceased, Charles Kabelmacher. I was with him from the 6th day of November, 1897, until the day of his death. He was very sick and sent for me to come and stay with him, which I did. He wanted me to nurse him because he said that he did not have proper care taken of him. He said that I should stay with him until he got better. During the first fourteen days we got along very nicely. He was very sick during that time, very weak, and had high fever. He would complain and talk of his surroundings. During the third week that I was with him he complained that his father-in-law had bothered him a great deal. After the first two weeks on one morning he complained of having had a bad night; he said that his father-in-law had treated him badly, tormented him. I asked him why, and he said that he had learned to know his father-in-law. I never approached him on the subject again, as he was very weak and sick and wanted to be let alone. He said on this same evening that he was afraid to stay alone with his father-in-law. On December 26, 1897, he was restless, disturbed, and worried about Hoffheinz, because Hoffheinz wanted his other son-in-law, Vogel, to stay with Charles, and Charley did not want him. After I stayed there two weeks, he had strong fever and got weaker all the time. He spoke very little while he was in that condition. He did not write any notes or letters while I was there. He was never able, after I went there, to get out of the bed or out of the chair when placed in it without help, except during the first eight days he could get up, after that he could not. I usually waited on him through the day. Two nights I stayed with him until midnight. Mr. Hoffheinz and Charley's brother and brother-in-law would stay with him at night. Myself, his sister and his sister-in-law would wait on him during the day. We would take

charge of him about 5 or 6 o'clock in the morning. After the first week he had always to be helped to be moved out of the bed. He would talk often but only a short time at once, but mostly he was quiet. When he had fever, he would talk delirious. Always when he had high fever he would talk delirious."

Cross-examination: "He was only delirious when he had fever. When he had no fever he was not delirious. His food was different; it consisted of meat, oatmeal, and light food. Myself or sister-in-law would attend him and give him his food. He would drink milkpunch, whisky, and beer, and sometimes coffee. He ate during the last week of his life, but could not sit up while eating; I fed him and he knew me. He knew me during the last week. During the last week he only seemed to know his own folks. He did not ask for drinks; we would ask him. He understood me when I asked him. He was sick in bed about two and a half months, from November 16, 1897, to January 21, 1898. He was up and about before the 6th of November. He took sick in November, was sent to the New Braunfels hospital, came home and got better, and then worse, and confined to his bed again. About December 26th, when he spoke of Hoffheinz, I could not understand him well; he would speak a few words and then stop; he was very much excited; he cried and spoke with excitement. Under such circumstances he would speak with vigor. On December 26th, when he spoke of Hoffheinz, he spoke with much vim and vigor. He was stronger on the 5th of December than on the 25th. I could understand him when he told me to come and stay with him. I knew before the signing of the will that I had an interest in the property. I knew that because my brother had no children. His wife helped to nurse him all the time. I sent my sister-in-law to tell Hoffheinz to come to the house one time. My sister was present when my brother Charley said he had a bad night. She was present on the 26th of December when he said that Hoffheinz had bothered him. He complained during the third week that Hoffheinz had bothered him; this was on the 26th day of December. He only complained once. Yes, I said that he complained twice. The statement that he complained twice is true."

Mrs. Edna Bartels, for contestants: "I was a sister of Charley Kabelmacher. I was at his place before he got sick. I went home and came back and was there the day before New Years, and the day after. I was there early in November. I heard that he was sick and went over there on that account. While I stayed there I did the house work and helped nurse him. I often attended him at night and also in daytime. My brother Charley Kabelmacher complained to me and my sister that he had a miserable night about the 16th of November. From the time that I went there to the time of my brother's death he was very weak. He did not talk much at a time and talked low. He became delirious at times the first week. He had fever almost every night. The table that was used for writing purposes was in the corner. There were two tables, one at the head and one at the side of the bed. My brother did not eat much. He was very thin. When I first went to him he could walk for about ten

days thereafter, and then he grew worse. After that he could not go from the bed to the chair or the chair to the bed without help."

Cross-examination: "It was only when he had fever that he was delirious. He was not delirious when he had no fever. His fever was high at night. At daytime he had heart contraction. Sometimes the fever would subside in the morning, sometimes earlier, at or near 12 o'clock. It generally subsided in the morning. His fever was mostly highest at night. It was not as high in the morning as in the night. He was not delirious in the morning when I was with him. I know nothing of my brother having signed a $360 check, some time after he signed the will. He signed something, but was so weak that he could not tell what he signed. He had one good eye and one bad one; his memory was weak, I do not know if he was strong enough to tell me his condition or not. I do not know when he signed the check."

Otto Bartels, for contestants: "I knew the deceased, Charles Kabelmacher. I saw him every Sunday for about two years before he died. I did not see him as much as twice a week during the last two months of his life. I stayed at his house sometimes two days at a time. He was weak physically and mentally. I could tell this by his talk; he talked low. He would say about a dozen words and then stop and change the subject. I can not say how long this was before he died. It was about a month or a month and a half though."

Cross-examination: "I do not know how his mind was on the 5th of December."

Ernest Elbel, for contestants: "I knew Charles Kabelmacher for about ten years. He was about 29 years old. During the last two months of his life I went around at intervals to sit up with him and to do work about the place. On November 16th I went to stay two days, and then went off and on until he died. At the beginning of the time that I was there he did not seem very weak. I went home, and when I returned to him he appeared very weak. I sat up with him at night. He had no fever at night at that time. He did not talk much, but only spoke a little. He looked emaciated. When talking he would break off suddenly. I never saw him write anything while I was there. He did not seem able to do so. The way he spoke to me is why I think his mind was weak. He could not talk to me for any length of time. I can not remember anything definitely that he said, but it was nothing important. The table on which the medicine, papers, ink, etc., stayed was at the head of the bed."

Cross-examination: "Yes, my wife is a party to this suit. I was not there; I could not see the deceased on December 5th. I do not know the condition of his mind on that day. I never saw him undertake during his sickness, to write a letter and not be able to finish it. I do not remember what he said to me when I talked to him. He talked about being sick. I did not talk much to him during October."

Otto Scheel, for contestants: "I knew Charles Kabelmacher about fifteen years before his death. I saw him the last two months of his life.

I stayed with him a week and then went away. I came back and stayed another week. I sat up with him at night. He never talked about a will to me nor about business. Four or five years ago I had charge of his stock, but not during his last sickness. During the last two months of his life while I was there he said he was sick. He was emaciated. I have helped him up and down from the bed. He always had to be helped to get up and into bed. The table on which the pen and ink stayed was at the head of the bed. A person lying on the bed on his back as Charles Kabelmacher did could not see one at the table unless he turned around. In order to do that he would have to rise up. The bed was high. The table stood at the back. The ink usually stayed on the table. I have seen Charles Kabelmacher when he had fever. He would talk delirious. From my long acquaintance with him in my estimation his mind was weak. I say this because after speaking a few words he would stop and say that he would have to have more time before he could finish what he was saying. That was his condition on the 5th of December. I do not know if this was his condition till he died. I came back to see him once in a while after December 5th."

Cross-examination: "I was not present at the time of the signing of the will. I can not say where the table was on the 5th day of December when they signed the will; I do not remember. I do not know the condition of his mind when he signed the will."

*J. D. Guinn*, for plaintiff in error.

*F. J. Maier*, for defendant in error.

KEY, ASSOCIATE JUSTICE.—Carl Kabelmacher died, and Emma Kabelmacher, his wife, sought to probate his alleged will. The brothers and sisters of the deceased contested Mrs. Kabelmacher's right to probate the will, and charged that Carl Kabelmacher was of unsound mind at the time that the will was made and that undue influence was used to procure the making of the will.

The case reached the District Court, where a jury trial was begun, but after the testimony was all in the court peremptorily instructed a verdict for Mrs. Kabelmacher, and entered judgment accordingly. The brothers and sisters have appealed, and assign this action of the court as error.

We have carefully examined the statement of facts, and our conclusion is that the court should not have withdrawn the case from the jury, but should have submitted the same for their decision on the issues presented. It is difficult to discuss the evidence and point out that portion of it which in our opinion entitles plaintiffs in error to have the case submitted to the jury, without intimating an opinion as to how the jury should decide. We therefore refrain from commenting upon the testimony.

On the other question presented in the briefs, we rule against the plaintiffs in error. The judgment is reversed and the cause remanded.

*Reversed and remanded.*

ON MOTION TO RETAX COSTS.

KEY, ASSOCIATE JUSTICE.—In the bill of costs in this case, the clerk of the District Court has charged for making the transcript, 15,789 words, at 20 cents per hundred, $31.60. A motion has been filed to retax this costs, the contention being that the clerk is entitled to only 10 cents for each hundred words, as compensation for making the transcript.

Section 22 of the fee bill passed by the Twenty-fifth Legislature (Acts Called Session Twenty-fifth Legislature, p. 12) prescribes. the fees which the district clerks may charge in civil cases, and among other items contains the following: "Making transcript of the records and papers in any cause upon appeal or writ of error, with certificate and seal, each one hundred words, ten cents." It is true that section 7 of the Act of the Legislature referred to exempts certain officers, including the district clerk, in counties which cast less than 3000 votes in the last presidential election, from the operation of sections 1, 2, 3, 4, 5, and 6 of said act; but these sections all relate to fees to be paid by the State in criminal cases, and have no reference to fees earned in civil actions. Section 7 of the act is not a limitation or qualification of section 22, which, in our opinion, applies to the clerk of the District Court of every county in the State.

The motion will be sustained, and the item of costs referred to reduced to $15.80.